**UNITED STATES of America**

v.

**MARCUS SCHLOSS & CO., INC. and D. Ronald Yagoda, Defendants.**

**No. 88 Cr. 796–CSH.**

United States District Court, S.D. New York.

April 11, 1989.

Benito Romano, U.S. Atty., S.D.N.Y., New York City (Howard Heiss, Carl Loewenson and Elizabeth Glazer, Asst. U.S. Attys., of counsel), for U.S.

Sullivan & Cromwell, New York City (Marvin Schwartz and Elise A. Bloustein, of counsel), for Marcus Schloss & Co., Inc.

Stanley S. Arkin, P.C., New York City (Stanley S. Arkin and James T. Wicks, of counsel), for D. Ronald Yagoda.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The indictment in this case alleges an insider trading conspiracy and related substantive counts. In addition to the two captioned defendants, the indictment also names as defendants Victor Teicher & Company, L.P.; Victor Teicher; and Ross S. Frankel. After the return of the indictment, all defendants made varying motions to dismiss certain counts, for severances, and for related relief. After those motions were fully briefed, and on the eve of oral argument, practical considerations intervened which affected the government's ability to proceed to trial on the scheduled date. I need not describe those considerations in detail. It is sufficient for present purposes to say that all parties agreed to partial severances, in consequence of which the trial against defendants Marcus Schloss & Co., Inc. ("Schloss") and Yagoda will take place first, with the trial (or trials) of the Teicher interests and Frankel being deferred until the fall. These arrangements, consented to by all parties and approved by the Court, solved the government's scheduling difficulties, while at the same time preserving the continuity of various defendants' legal representation.

Notwithstanding this partial accord, disputes remain concerning the structuring of the trial of Schloss and Yagoda.

The first relates to a "further object of the conspiracy" alleged in paragraph 15 of Count One of the indictment. Paragraph 15, as redacted for use in the severed trial of Schloss and Yagoda, reads as follows:

"It was a further object of the conspiracy that the defendants and their co-conspirators unlawfully, knowingly, wilfully, and corruptly would and did endeavor to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit, the SEC, by, among other means, urging witnesses and potential witnesses to lie to the SEC, in violation of Title 18, United States Code, Section 1505."

Counsel for Schloss and Yagoda argue that the face of the indictment, viewed in the light of certain undisputed facts, makes

it plain that obstruction of the SEC investigation cannot be included as a part of the single insider trading conspiracy alleged in Count One. Accordingly Schloss and Yagoda seek to redact paragraph 15 of Count One from the indictment, and to preclude evidence at trial in relation to it. Alternatively, these defendants move *in limine* to exclude the relevant evidence under Rule 403, F.R.Evid.

The second dispute deals with references in the redacted indictment to other defendants and co-conspirators, mainly to defendants Victor Teicher & Company and Victor Teicher personally. As noted, the Teicher interests are charged as co-defendants in the original indictment, together with Ross Frankel; but these defendants will be tried separately from Schloss and Yagoda. As part of that arrangement, AUSA Heiss acknowledged at oral argument on March 3, 1989 (Tr. 15):

"... we have agreed to cut off that part of the conspiracy charge that alleges the theft of inside information from Drexel by Frankel and Salsbury and not offer proof with respect to those transactions in the context of the severed case against Yagoda and Marcus Schloss."

Notwithstanding that partial limitation of the proof against Schloss and Yagoda, and the consensual severance of the Teicher defendants and Frankel from the trial of Schloss and Yagoda, the government declines to redact from the indictment to be presented to the Schloss/Yagoda jury references to the Teicher defendants' alleged insider trading, as well as limited references to Salsbury and Frankel (Drexel, Burnham and Lambert employees); and intends to offer proof in support of those allegations.

Schloss and Yagoda argue that references to the Teicher defendants' trades, and to other individuals, should be redacted from the indictment on their trial, and such proof be excluded, on the grounds that Count One of the indictment is duplicitous on its face, or alternatively, such proof would be unfairly prejudicial.

Third, Schloss and Yagoda attack the legal sufficiency of certain substantive securities charges against them.

Fourth, Yagoda contends that counts charging perjury and obstruction of justice by him should be severed for separate trial.

I address these issues *seriatim*.

## I.

*Obstruction of the SEC Investigation as an Object of the Conspiracy.*

Schloss and Yagoda first attack the inclusion of paragraph 15 of Count One on the basis that the indictment constitutes a facial violation of the rule declared in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). *Grunewald* involved a conspiracy to operate a scheme to fix tax fraud cases. The scheme generated a congressional committee investigation. Various defendants undertook steps to conceal their criminal conduct from that committee. The government filed its tax fraud conspiracy indictment after the statute of limitations had run. The Supreme Court rejected the government's argument that the coverup should be regarded as part of the original conspiracy, thus bringing it within the statute of limitations.

In the case at bar, the government argues that the Supreme Court's rationale in *Grunewald* (to which I will shortly turn) has no application because the statute of limitations is not implicated here. That is true, but the distinction does not fully dispose of the issues. The Court in *Grunewald* cited and built upon *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Both *Krulewitch* and *Lutwak* dealt with the admissibility of hearsay declarations of co-conspirators after the main purpose of the conspiracy had been accomplished. Seeking to obtain that evidentiary advantage, the government in those cases "attempted to extend the life of the conspiracy by an alleged subsidiary conspiracy to conceal." *Grunewald* 353 U.S. at 401, 77 S.Ct. at 972.

Thus in each of these three cases, the government sought for one tactical purpose or another to extend in time a conspiracy which involved the same participants throughout. The case at bar presents the question of the facial sufficiency of an indictment alleging concealment as one of the objects of a single conspiracy involving a number of people, only some of whom are specifically alleged to have participated in the concealment efforts.

It is now useful to examine in closer detail the Court's analysis in these three cases.

In *Grunewald* the Court said at 401–02, 77 S.Ct. at 972–73 that the "crucial teaching" of *Krulewitch* and *Lutwak* is that:

"... after the criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."

The Court went on to reject the government's argument that efforts of concealment should be regarded as part of the single, original conspiracy. The government lost on that issue because:

"There is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Id.* at 404, 77 S.Ct. at 973.

At 404 n. 16, 77 S.Ct. at 973 n. 16, the *Grunewald* Court said of both *Grunewald* and *Krulewitch:*

"... the essential missing element is a showing that the act [of concealment] was done in furtherance of a prior criminal agreement among the conspirators."

Schloss and Yagoda argue that the indictment at bar contains no allegation of "an express original agreement among the conspirators" to cover up their activities from the SEC. They argue further that, to the extent such efforts took place, there is no reason to believe, and every reason to

disbelieve, these particular defendants' participation in or awareness of such efforts.

The government replies that the indictment alleges that all the activities described in Count One were in furtherance of a single conspiracy, and that allegation suffices, at least at the pre-trial stage.

That response, if well taken, disposes of both arguments made by defendants, since if obstruction of the SEC inquiry was in fact an object of the original, single conspiracy, and Schloss and Yagoda were members, it matters not that Schloss and Yagoda may have lacked precise knowledge of what each co-conspirator was doing at a particular time.

Therefore the crucial question at bar is whether the *Grunewald* rationale applies to the face of this indictment.

The government characterizes Count One of the indictment as a conspiracy to steal nonpublic information and then use that information for defendants' benefit and the benefit of their co-conspirators. One aspect of that conspiracy, the government continues, was the taking of steps necessary to conceal the thefts and the sources of the information. Paragraph 15 constitutes a specific charge that it was an object of the conspiracy to endeavor to obstruct the SEC investigation by suborning perjury. Thus, in the government's view, the conspiracy charged in Count One "was a continuous effort to misappropriate and use material nonpublic information and to conceal the use of such information." Government's January 20, 1989 Brief at 17. To distinguish the *Grunewald* rule, the government relies upon *United States v. Potamitis,* 739 F.2d 784 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed. 2d 232 (1984), and *United States v. Cunningham,* 723 F.2d 217 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984).

*Potamitis* involved a conspiracy to stage a robbery of an armored car, followed by the dealing with and division of the proceeds. Following conviction, the conspirators argued on appeal that one conspiracy had been charged and two proven, resulting in a fatal variance. The Second Circuit,

affirming the convictions, stated generally at 787 that "whether the proof establishes a single or multiple conspiracies is an issue of fact singularly well-suited to resolution by the jury." The court of appeals distinguished *Grunewald* by parsing its rationale as follows:

"The [*Grunewald*] Court went on to make a 'vital' distinction 'between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.' 353 U.S. at 405 [77 S.Ct. at 974]. We believe this case is a clear example of the former." 739 F.2d at 788 (emphasis in original).

In *Cunningham*, one Sweeney, a co-defendant in a two-defendant indictment alleging a single conspiracy, argued on appeal that two conspiracies were in fact proved: a conspiracy to evade taxes owed by co-defendant Cunningham; and a later, separate conspiracy to conceal the first.

The Second Circuit rejected Sweeney's appeal. It reiterated that the issue of single versus multiple conspiracies was ordinarily a question for a properly charged jury. The court of appeals then went on to deal with the question of prejudice. It reasoned that even if the trial evidence showed two conspiracies rather than one, no prejudice to Sweeney resulted, since he was a "member of the conspiracy at its outset", so that his position differed "sharply" from the defendants in *Grunewald, Lutwak,* and *Krulewitch,* "where cover up or concealment was not an actual part of the basic conspiracy but merely an implied consequence." 723 F.2d at 229. The court of appeals continued:

"Thus, since Sweeney participated in the unlawful activities from the beginning to the end, he would not be able, even if multiple conspiracies had been shown, to demonstrate any resulting prejudice to himself." *Ibid.*

Judge Keenan's opinion in *United States v. David,* 86 Cr. 454 (JFK), 1986 WL 13805 (S.D.N.Y., decided November 21, 1986) is instructive because it involves the same conspiracy alleged in the present indictment. Until the conspiracy was detected, David was an associate at the Paul, Weiss law firm. The indictment charges Schloss and Yagoda with seven substantive counts of insider trading in connection with trading in five stocks. On four of those five stocks the government alleges that David tipped inside information he had acquired to Andrew Solomon, a Schloss employee, who passed the information on to Yagoda, who in turn caused Schloss to trade in the securities in question. With respect to the fifth of the five securities involving Schloss and Yagoda, the government charges that the flow of inside information went the other way: from Yagoda through Solomon to David.

Judge Keenan's opinion deals with the government's eighteen-count indictment returned against David alone, charging him with conspiracy, insider trading, mail fraud, and endeavoring to obstruct the SEC investigation. David subsequently entered a plea of guilty and is now cooperating with the government. Before doing so, however, he challenged by motion the indictment against him. David contended that "the alleged agreement to conceal insider trading forms a separate conspiracy from that to engage in the trading and arose only after the trading conspiracy had been fully executed." 1986 WL 13805, LEXIS slip op. at 3.

The facts as recited in Judge Keenan's opinion were that on March 26, 1986 partners of the Paul, Weiss firm confronted David with allegations of insider trading. Also on March 26, warrants issued for the arrest of David and Solomon. Solomon was met at his home later that day by federal agents. Solomon agreed to cooperate with the government and was fitted with a concealed tape recorder. He then met during the evening of March 26 with David and another conspirator, Salsbury, in David's apartment in Manhattan and recorded their conversation. That conversation is pleaded as overt act 51 in the indictment, and the government wishes to offer the tape recording into evidence against Schloss and Yagoda.

Judge Keenan rejected David's argument that the conspiracy count must be dismissed as duplicitous. He cited *Cunningham, supra,* and *Potamitis, supra,* for the proposition that the existence of a single conspiracy or multiple conspiracies is a question of fact to be resolved by the jury. Judge Keenan then dealt directly with *Grunewald. Grunewald,* in his view, was distinguishable; he wrote 1986 WL 13805 at slip op. 4:

> "In the instant case, the statute of limitations is not a factor and even if the Court were to order that the government seek a superseding indictment with the conspiracy allegations divided into two counts, those counts would be properly joined and tried by the same jury. Accordingly, no prejudice to David arises from the inclusion within the conspiracy count of allegations that the conspiracy included an agreement to conceal." *Ibid.*

Having reviewed these authorities, it is fair to say that the facts in each of them can be distinguished one way or another from the facts at bar. Thus the government is correct when it observes that the concealment conspiracy is not tacked on to avoid the statute of limitations. On the other hand, the facts in *Potamitis* and *Cunningham,* upon which the government relies, are quite different from what the facts in respect of concealment appear to be in the case at bar. In *Potamitis,* an agreement to deal with and divide the spoils of a robbery is obviously inherent in, and essential to the success of, the initial agreement to stage the robbery. The *Grunewald* analysis has nothing to do with such facts, as the court of appeals observed without difficulty. As for *Cunningham,* the court of appeals in affirming Sweeney's conviction stressed the lack of prejudice to him at trial, even if two conspiracies were proven, since the evidence showed that he was a member of the conspiracy (or conspiracies) from the start, and fully participated in all the criminal acts. That retrospective, post-conviction finding of lack of prejudice also underlies Judge Keenan's prospective, pre-trial finding of lack of prejudice in *David,* a single-defendant case.

The case at bar differs markedly in respect of potential prejudice to Schloss and Yagoda. Reading the indictment at bar in the light of Judge Keenan's opinion in *David,* it would certainly appear that the then-cooperating Solomon's wired conversation with David and Salsbury on March 26, 1986 constituted the first overt act in furtherance of the conspiratorial object alleged in paragraph 15 of the indictment: obstructing the SEC investigation by suborning perjury. The indictment nowhere alleges that Yagoda or anyone at Schloss (with the exception of Solomon) knew of this conversation or took any action in consequence of it.

The government's answer, as noted, is that the indictment alleges throughout, explicitly or implicitly, the insider trading conspirators' objective of secrecy; and that the objective of obstructing the SEC investigation should be regarded as part of a single, seamless conspiratorial web.

If that were a fair characterization, then *Grunewald* and comparable cases would not apply. But I cannot accept at face value the government's analysis of the case at bar. Of course, during the lifetime of the insider trading conspiracy, the conspirators attempted to preserve secrecy. David, for example, kept secret from his Paul, Weiss employers the misappropriation of clients' nonpublic information they entrusted to him; Yagoda, who the government charges with knowingly trading on such information, could not be expected to proclaim to the world that he was doing so. But I perceive a quantum difference between this sort of concealment, inherent in all insider trading conspiracies so long as they remain undetected and in operation, and a conspiracy to obstruct justice once the conspiracy is detected and comes to an end. That is what happened in the case at bar, with the confrontation of David by the Paul, Weiss partners on March 26, the arrest of Solomon that same day, and David's arrest early the following morning.

Thus the insider trading conspiracy came to an end on March 26–27. It cannot be said that the conspiracy came to an end because it had fully achieved or attained its

purposes; one can reasonably infer that, absent detection, the conspirators would have continued their insider trading indefinitely. Thus the case is distinguishable from *Grunewald* in respect of the manner in which the conspiracy came to an end; but end it did, as the result of its detection: and a fair reading of the indictment, in the light of what we know from other sources, indicates that the particular obstruction conspiracy described in paragraph 15 of the indictment was hatched in David's apartment on March 26 during a conversation in which the present defendants did not participate, and of which the government does not allege they had knowledge.

In these particular circumstances, I conclude that as a matter of pleading, this indictment falls closer to what *Grunewald* prohibits than it does to what *Potamitis* and *Cunningham* permit.

There is also the matter of prejudice to Yagoda and to Schloss. Unlike co-defendant Sweeney in *Cunningham*, there is no reason to suspect, and every present reason to doubt, that Yagoda was a part of the SEC obstruction conspiracy evidently hatched at David's apartment on March 26, 1986. However, Yagoda is charged in Counts Thirty and Thirty-one with perjury and obstruction in respect of testimony he gave to the SEC on October 10, 1986. Absent any showing that Yagoda was involved with the agreement to obstruct arising out of the March 26, 1986 meeting in David's apartment, evidence of that March agreement would unfairly prejudice Yagoda in his defense of the obstruction and perjury charges arising out of testimony he gave seven months later.

█ In sum, I reject the government's argument that the object of obstructing the SEC inquiry alleged in paragraph 15 of the conspiracy count forms an inherent and indivisible part of a single conspiracy of secrecy and silence. Rather, I believe that

objective to be a joint effort by some of those involved in an insider trading conspiracy who "took care to cover up their crime in order to escape detection and punishment." *Grunewald* 353 U.S. at 402, 77 S.Ct. at 972. As such, it cannot form a part of the original conspiracy, in the absence of proof of an express original agreement on the part of the conspirators to commit and suborn perjury before the SEC if the conspiracy was detected.

There is no present indication that the government has such proof. If it does, I will consider it *in camera;* and the government is directed to submit a written offer of proof to the Court, *in camera* and *ex parte,* within ten (10) days of the date of this memorandum opinion and order.[1] If I am not satisfied by that proffer, then consistent with this opinion, I will redact paragraph 15 from Count One, together with overt act 51, as well as any other overt acts limited to the paragraph 15 alleged object; and preclude evidence of these occurrences.

### II.

*Admissibility at Trial of Schloss and Yagoda of Evidence of Insider Trading by Other Alleged Co–Conspirators.*

As noted, the government has for practical reasons consented to the separate trial of Schloss and Yagoda. The government also agrees that it will not offer evidence at this trial of the theft of inside information in respect of four securities from the Drexel Burnham Lambert firm by co-defendant Frankel and co-conspirator Salsbury, as alleged in the indictment.

But the government does intend to offer at the Schloss/Yagoda trial evidence of insider information conveyed by David concerning certain securities to other alleged co-conspirators as well as to Yagoda: namely, Victor Teicher and co-defendant Frankel and alleged co-conspirator Robert

---

**1.** While I find no case directing this procedure in comparable circumstances, I find none prohibiting it, and the procedure seems fair to both sides. The government is not required to display its proof to defense counsel in advance of trial; but the trial court is able to make an informed evaluation before the pressures inherent in mid-trial rulings intrude. *See,* in that regard, Judge Friendly's analysis in *United States v. Miley,* 513 F.2d 1191, 1209 (2d Cir. 1975), quoted in Point II *infra.* Any offers of proof will be kept under seal for possible appellate review.

Salsbury, both associated with Drexel. In addition, the government wishes to offer evidence in respect of another security that David, after having received insider information from Yagoda through Solomon, passed it on to Teicher, who then traded in that security.

Schloss and Yagoda seek to preclude this evidence on the ground that the conspiracy count is duplicitous on its face. Schloss and Yagoda originally challenged the conspiracy count as duplicitous in aid of their motion for a severance. They have now obtained a separate trial, but press their case for a redacted indictment and limitation on the government's proof on the alternative grounds of relevance and prejudice.

Relevance poses the issue of single versus multiple conspiracies. The threshold inquiry is whether the indictment on its face alleges separate conspiracies: one involving illicit trading by Yagoda and Schloss on the basis of tips received from David (or in one case conveyed by Yagoda to David); and another involving insider trading by others on the basis of tips received from the same source, i.e., David.

■ That inquiry arises at bar in the context of admissibility of evidence, rather than recasting of the indictment or severing defendants for trial. But the same principles apply. With regard to nonpublic information misappropriated by David from Paul, Weiss, David may be regarded as the center of a "wheel" conspiracy, and his tippees as spokes on the wheel. It is, of course, well settled that the spokes cannot be characterized as co-conspirators with each other in a single conspiracy solely because they share a common source at the center. To constitute a single conspiracy, the government must allege and prove that each of the charged conspirators on the rim "had sufficient awareness of the existence of other members of the alleged conspiracy to render them part of the 'rim of the wheel to enclose the spokes.'" *United States v. Zabare*, 871 F.2d 282, 287–88 (2d Cir.1989) quoting *Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. at 1239, 1243, 90 L.Ed. 1557 (1946). *See also Unit-*

*ed States v. Manarite*, 448 F.2d 583, 589–90 (2d Cir.), *cert. denied*, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971) ("In such conspiracies, whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy.").

Typically appellate courts consider the duplicitousness of a conspiracy charge after trial, in view of the practical realities tellingly described by Judge Friendly in *United States v. Miley*, 513 F.2d 1191, 1209 (2d Cir.1975):

"In the typical case, when severance motions are made at the beginning of trial, the judge and even the prosecutor may not be certain whether the evidence will support a single conspiracy charge. By the time the evidence has been given, however, a good deal of effort has been invested and the district judge is properly reluctant to grant such motions at that time, especially since the jury might moot the question by acquitting. See 8 Moore, *supra*, Par. 8.06[3], at 8–41. Appellate courts are similarly reluctant to overturn convictions for denial of motions for severance absent a showing of serious prejudice."

But it is conceptually possible for an indictment to be drawn so as to contravene Rule 8(b) joinder of defendants on its face, *United States v. Levine*, 546 F.2d 658, 666 (5th Cir.1977); and, in *United States v. Tufaro*, Dkt. No. S82 Cr. 838 (WK) (S.D.N.Y., decided October 12, 1983)*, Judge Knapp observed: "A reading of the substantive narcotics counts does indeed give the impression that two separate core groups of defendants were engaged in selling narcotics...." slip op. at 42. As it happened, the government in *Tufaro* expressed its intention to dismiss the charges against one of the core groups for venue purposes, so Judge Knapp did not need to concern himself with how many conspiracies the

---

* Opinion as submitted for publication, 593    F.Supp. 476.

trial evidence would demonstrate. But I must do so in the case at bar, since if the David/Teicher conspiracy existed separately from the David/Yagoda/Schloss conspiracy, evidence of the transactions involving the former conspiracy should not be received at the trial of Schloss and Yagoda, on the ground of relevance or, alternatively, unfair prejudice under Rule 403. As Chief Judge Weinstein wrote in *United States v. Gallo*, 668 F.Supp. 736, 756 (E.D. N.Y.1987), it is not always sufficient for the government to speak in terms of proving the "big picture."

I have noted the government's argument that since the indictment contains language alleging a single conspiracy, that is a sufficient answer to defendants' concerns, at least at the pre-trial stage.

If the conspiracy charged in this indictment fell under the RICO statute, the government's argument would be on stronger ground. That is the thrust of *United States v. Friedman*, 854 F.2d 535 (2d Cir.1988), upon which the government places a not wholly justified reliance. Under Rule 8(b), F.R.Crim.P., "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Judge Winter wrote in *Friedman* that the rule's limitations on a prosecutor's power to charge multiple defendants in a single proceeding is lessened, and "that power is probably at its greatest when RICO conspiracy charges are brought." 854 F.2d at 561. That is because: "A RICO charge under § 1962(c) necessarily incorporates allegations that each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise." (citing and quoting *United States v. Castellano*, 610 F.Supp. 1359, 1396 (S.D.N.Y. 1985) (Sofaer, J.)). Therefore, Judge Winter concluded in *Friedman:* "In evaluating the defendants' claims of misjoinder under Rule 8(b), then, our task is limited simply to determining whether the indictment properly alleged their participation in a

RICO conspiracy." *Ibid.* The conspiracy count in *Friedman* satisfied that standard.

That the standards are significantly different in non-RICO cases was emphasized by Chief Judge Weinstein in *Gallo, supra*. He considered the allegations of an indictment charging a single organized crime conspiracy. Judge Weinstein wrote:

> "If we were to apply pre-RICO concepts of conspiracy to this case, we would likely find that a single overarching conspiracy could not be charged based on these allegations."

But RICO makes a difference:

> "This new notion furnishes prosecutors a much broader scope of authority for joining defendants who are alleged to have participated in a common grouping or association." 668 F.Supp. at 747.

In a recent opinion, *United States v. Attanasio*, 870 F.2d 809 (2d Cir.1989), a non-RICO case, the Second Circuit stated that where (as in the case at bar) the indictment's joinder involves both multiple offenses and multiple defendants, Rule 8(b) governs the propriety of the joinder. At 814–15 (citing *United States v. Turoff*, 853 F.2d 1037, 1043 (2nd Cir.1988)). The court of appeals went on to say in *Attanasio:*

> "*The Rule requires an allegation* that the defendants 'have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.' Fed.R.Crim.P. 8(b). We read this to mean that the acts must be 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme . . .' " (citations omitted) at 815 (emphasis added).

The requirement that a single conspiracy be alleged in the indictment permits pre-trial judicial scrutiny of the allegations' sufficiency. *Gallo, supra; Tufaro, supra*. Application of these principles to the case at bar requires *further analysis of the indictment*.

The conspiracy account alleges that David misappropriated from Paul, Weiss material, nonpublic information in respect of five "target" companies: Union Carbide;

American Can Corp.; Allegheny International Inc.; Avondale Mills; and American Brands. The conspiracy count identifies David's tippees for each of these securities, and then proceeds to charge certain defendants with substantive counts of insider trading in those shares.

As to Union Carbide, only Solomon is named as David's tippee; and only Schloss and Yagoda are named in the substantive counts (Two and Thirteen).

As to American Can Corp., David's identified tippees are Teicher, Salsbury and Solomon. Only the Teicher defendants are named in the substantive counts.

As to Allegheny International Inc., David's tippees are identified as Teicher, Salsbury, and Solomon; Schloss and Yagoda are named in the substantive count (Seven), as are the Teicher defendants.

As to Avondale Mills, David's tippees are identified as Teicher, Salsbury, and Solomon; Schloss and Yagoda are named in the substantive counts (Eight and Fourteen), as are the Teicher defendants.

As for American Brands, David's tippees are identified as Teicher, Salsbury and Solomon; Schloss and Yagoda are named in the substantive count (Ten), as are the Teicher defendants and Frankel.

The indictment refers to Yagoda and Solomon in respect of a sixth company: Revco D.S., Inc. As to this company, Yagoda and Solomon are alleged to have tipped inside information to David, who in turn passed it on to Teicher. Schloss and Yagoda are named in the substantive count (Eleven), as are the Teicher defendants.

All these activities, the government alleges in introductory, broad and conclusory language, formed part of a single conspiracy. But the overt acts and substantive counts are equally consistent with David passing on inside information to more than one tippee, with each tippee unaware of the existence and activities of any other tippee. If those are the underlying facts, a single conspiracy cannot be proven. The case would then be on all fours with *Kotteakos, supra.* It would be impossible in such circumstances to say that the acts of several tippees, each unknown to the others, were "unified by some substantial identity of facts or participants", or that they "arose out of a common plan or scheme", *Attanasio, supra.*

At oral argument government counsel laid particular emphasis upon *United States v. Nerlinger,* 862 F.2d 967 (2d Cir. 1988). In *Nerlinger,* the head trader of a commodity corporation, one DeAngelis, devised a scheme to defraud customers and enrich certain salesmen as well as himself. DeAngelis manipulated trades in order to show profits in those salesmens' accounts. Two salesmen, Nerlinger and Varipapa, were convicted of participation in a single conspiracy with DeAngelis. They contended on appeal that the evidence showed two separate conspiracies, rather than one. The Second Circuit rejected the appeal because of the trial evidence. Nerlinger, Varipapa and DeAngelis were all employees of the same brokerage house; and "DeAngelis testified that both Nerlinger and Varipapa entered the fraudulent scheme only after being alerted to it by the peculiar performance of others' accounts." 862 F.2d at 973. In these circumstances, the court of appeals concluded, "the jury had sufficient evidence from which to infer that the appellants knew their activities were parts of a larger enterprise operated by DeAngelis." *Ibid.* It followed that in *Nerlinger* the government proved the fact that the various conspirators "knew or must have known of the existence of other conspirators", *Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947), a circumstance sufficient to take the case out of the *Kotteakos* rule.

The indictment at bar does not expressly allege that David's tippees knew of each others' existence; nor does it allege specific facts from which such an inference could be drawn. That does not mean that the government does not have such evidence, to shore up its conclusory allegation of a single conspiracy. That David's tippees were not acting in entire isolation may be inferred from the fact that when Solomon, having been wired by the government, arranged a conference with David, Salsbury

also attended (although there is no present suggestion that Teicher was involved in these events).

If the case were before me on the original motions of all defendants to dismiss the conspiracy count as duplicitous, I would have three options: to conclude that the conspiracy count was facially duplicitous, and require repleading or separate trials; to accept the government's conclusory allegation of a single conspiracy and deny any pre-trial relief; or to regard the single conspiracy allegation as problematical at best, and require the government to make an *in camera, ex parte* offer of proof prior to trial. I believe, had the original motions come to fruition, that I would have inclined towards that middle course.[2]

But we are overtaken by events; *faut de mieux*, the government has been obliged to grant Yagoda and Schloss a separate trial. Therefore the question is no longer whether Yagoda and Schloss should be tried separately from the other defendants. The question is the admissibility of other defendants' acts at the trial of Yagoda and Schloss alone.

That question squarely implicates Rule 403, F.R.Evid.; and I conclude without difficulty that even assuming the government has sufficiently alleged and could prove a single conspiracy of the sort demonstrated in *Nerlinger*, the Rule 403 balance tips against the admissibility of other tippees' individual acts at a separate trial of Yagoda and Schloss.

Rule 403 is essentially a rule of fairness. It is fair to require the government to prove its conspiracy and substantive charges against Yagoda and Schloss on the basis of their own acts, and not the acts of others. It would be unfair to require Yagoda and Schloss to explain and defend not only their own acts, but the acts of others, such as the Teicher defendants. Indeed, how could counsel for Yagoda and Schloss fairly be expected to defend and explain the acts of others such as Teicher? Teicher, awaiting his own separate trial, is not likely to be forthcoming and cooperative. And yet the jury would hear detailed evidence of Teicher's tips and trades, with counsel for Yagoda and Schloss essentially helpless to deal with them, or to prevent the inevitable, cumulative, spillover effect upon their own clients.

The government, on the other hand, has no pressing need for evidence of other defendants' acts to convict Yagoda and Schloss. David will presumably be the principal witness against Yagoda and Schloss; if the jury credits his testimony, as foretold by the indictment, the jury will have a sufficient factual basis to convict Yagoda and Schloss on the conspiracy and substantive securities counts. On the other hand, if the evidence of wrongdoing by Yagoda and Schloss is relatively weak, but stronger against the Teicher defendants—I speak only hypothetically, I know nothing of the evidence—Yagoda and Schloss would be unfairly prejudiced by evidence of the wrongful acts of others, acts they did not themselves control. And that unfairness would exist even assuming that Yagoda and Schloss were generally aware of the existence of other unknown tippees, and hence participants in a single conspiracy under cases such as *Nerlinger*.

With respect to nonpublic information misappropriated from Paul, Weiss and its clients, the faithless associate David is the core conspiracy figure. The indictment alleges David took this information and (a) tipped Yagoda, who caused Schloss to trade; (b) tipped Victor Teicher, who caused Victor Teicher & Company to trade; and (c) tipped unindicted co-conspirator Salsbury, who in turn tipped Frankel.

As noted, the parties dispute whether a single, David-centered conspiracy existed (as the indictment alleges), or whether three separate conspiracies existed, *Kotteakos*-like, with David at the center of each.

One can without oversimplification envision three possibilities: (1) the defendants at the end of each "spoke" (Yagoda, Teicher, Frankel) had no connection with or knowledge of each other's existence or acts; or (2) they knew their own activities were parts of a larger insider trading en-

2. See fn. 1, *supra*.

terprise beginnwith David, but did not know or conspirectly with each other; or (3) they hadcific knowledge of each other's existennd acts, and worked together to make conspiracy succeed.

Under scena:1), there were multiple conspiracies, n( single conspiracy. Under scenario (2)pre was a single conspiracy of the soilustrated by cases like *Nerlinger*. Unscenario (3), there was a single conspira *fortiori*.

If in fact thiwere only multiple conspiracies prese-scenario (1)—then by definition the ˋoda/Schloss jury should not hear refere to or evidence concerning members different conspiracies.

But if ingle conspiracy in fact existed, I conclɪ that under that principle of fairness anɪlated in Rule 403, the government mɪinclude reference to conspirators in otɪ spokes, and adduce evidence of their ts, *if and only if* it was the sort of fɯlown, closely integrated single conspirɪ envisioned by scenario (3).

That circumɪnce would be presented if the governmeris in a position to prove that Yagoda wked with other tippees in other spokes tɪurther a common scheme. If, for examplɪYagoda and Teicher both received infoɪation originating with David in respeɪ of a particular stock, and they coordinatɪ their trading activities to facilitate the ɶrall scheme, there would be no unfairnɪ to Yagoda or Schloss in having the jurɪlearn of it. But absent an offer of proof f such a nature, I will for the reasons stæd redact the indictment as Yagoda and ɪhloss ask me to do, and preclude proofof other individuals' acts.

The government is directed to make a written offer oɪ such proof, if available, *in camera* and *exparte*, within ten (10) days of the date of this Opinion and Order.

## III.

*Validity of SEC Rule 14(e)–3.*

With respect to each of the five stocks identified in the substantive charges against Yagoda and Schloss, violations are alleged of Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 promulgated thereunder (Indictment, Counts, Two, Seven, Eight, Ten and Eleven). Two of the stocks—Union Carbide and Avondale—involved tender offers. As to them, the government charges an additional count each of insider trading, in violation of Section 14(e) of the Exchange Act and Rule 14e–3 promulgated thereunder (Indictment, Counts, Thirteen and Fourteen).

Yagoda and Schloss attack these latter two counts as based upon an invalid SEC rule. Specifically, defendants claim that Rule 14e–3 constitutes an impermissible extension of the SEC's rulemaking power.

It would appear that this issue was first presented for judicial decision in *United States v. Chestman*, 704 F.Supp. 451 (S.D. N.Y.1989). Judge Walker upheld the validity of Rule 14e–3 and refused to dismiss counts in an indictment charging violation of the rule. I agree with Judge Walker's careful analysis and reach the same conclusion.

Rule 14e–3 provides in pertinent part: "(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is non-public and which he knows or has reason to know has been acquired directly or indirectly from (1) the offering person, (2) the issuer of the securities sought or to be sought by such tender offer, or (3) any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information

and its source are publicly disclosed by press release or otherwise."

The SEC promulgated Rule 14e–3 pursuant to authority delegated to it by the Congress in a 1970 amendment to § 14(e) of the 1934 Act. § 14(e), as originally enacted in 1968 as part of the Williams Act, provided:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

In 1970 Congress amended § 14(e) so as to add an additional sentence, which reads:

"The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

The Supreme Court has said, in the context of a private action, that § 14(e) "adds a 'broad anti-fraud prohibition,' *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), modeled on the anti-fraud provisions of § 10(b) of the Act" and its accompanying rules. *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 10, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985). The Court held on the particular facts in *Schreiber* that the actions of the tender offeror did not constitute misrepresentation or disclosure; and that: "Without misrepresentation or nondisclosure, § 14(e) has not been violated." *Id.* 472 U.S. at 12, 105 S.Ct. at 2464. The unsuccessful plaintiffs in *Schreiber* urged that the 1970 amendment to § 14(e) strengthened their case, but the Court disagreed at 11 n. 11:

"In adding the 1970 amendment, Congress simply provided a mechanism for defining and guarding against those acts and practices which involve material misrepresentation or disclosure. The amendment gives the Securities and Exchange Commission latitude to regulate nondeceptive activities a 'reasonably designed' means of preventing manipulative acts, without suggesting any change in the meaning of the term 'manipulative' itself".

Defendants at bar argue that in enacting Rule 14e–3, the SEC impermissibly extended its rulemaking power, derived from § 14(e), so that the rule is null and void. If that contention is accepted, then of course the substantive counts based upon violations of the rule would fall.

Presumably the SEC perceived Rule 14e–3 as a valid exercise of its statutory authority. The courts' power to review an agency's discharge of responsibility primarily entrusted to it by Congress, while not foreclosed, is limited to determining whether the agency has exceeded its statutory authority, and whether the regulation is arbitrary and capricious. *Herweg v. Ray,* 455 U.S. 265, 275, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982); *Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977); *Merrill Lynch, Pierce, Fenner & Smith v. Bobker,* 808 F.2d 930, 936 (2nd Cir.1986) and cases cited. *Cf.* § 25(b)(4) of the Exchange Act, 15 U.S.C. § 78y(b)(4) (in proceeding by person adversely affected by an SEC rule to challenge it, the court "shall affirm and enforce the rule unless the Commission's action in promulgating the rule is found to be arbitrary, capricious, and in abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law."). The burden of persuasion on these issues falls upon the party challenging the validity of the rule.

Defendants contend that the SEC exceeded its rulemaking authority in two respects: (1) imposing liability on the basis of mere possession of nonpublic material information without a pre-existing fiduciary duty

or duty to disclose; and (2) measuring liability by "a mere negligence standard" rather than requiring proof of scienter. Brief at 18.

Defendants argue that both actions should be proscribed because they carry the SEC to a higher and more intrusive level of regulation than that generated by § 10(b) of the 1934 Act and its accompanying rules. Cases such as *Chiarella v. United States*, 445 U.S. 222, 223, 100 S.Ct. 1108, 1112, 63 L.Ed.2d 348 (1980) and *Dirks v. Securities and Exchange Commission*, 463 U.S. 646, 657, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983) are cited in support of that proposition, together with the Court's observation in *Schreiber, supra,* at 472 U.S. 10, 105 S.Ct. at 2463, that § 14(e) was "modeled on the anti-fraud provisions of § 10(b) of the [Exchange] Act and Rule 10(b)–5."

Judge Walker accepted in *Chestman, supra,* that "Congress delegated a different and greater level of authority to the SEC pursuant to § 14(e) than it had pursuant to § 10(b)." At 457. I agree with Judge Walker's analysis of the statutory scheme; and conclude, with him, that Rule 14e–3 constitutes a valid exercise of that greater level of congressional authority. Protection of the unwitting shareholder lay at the heart of the Williams Act. As the Supreme Court observed in *Schreiber, supra,* the 1970 amendment to the statute gave the SEC "latitude to regulate nondeceptive activities as a 'reasonably designed' means of preventing manipulative acts ..." 472 U.S. at 11 n. 11, 105 S.Ct. at 2464 n. 11. Judge Lasker has written for this Court that the rulemaking authority Congress granted to the SEC by the 1970 amendment to § 14(e) "is open-ended as to the transactions which might be covered and the broad grant of authority to the SEC to define the particular practices banned by the statute supports the proposition that the statute was not intended to be limited as defendants assert ..." *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1191 (S.D.N.Y.1981) (rejecting contention that Rule 14e–3 covers only transactions between tender offeror and a shareholder of target company, and not transactions in open market).

To prevail on their first ground of objection, defendants must demonstrate that notwithstanding this judicially recognized, broad and open ended regulatory latitude, the SEC exceeded its rulemaking powers when in tender offer situations it extended liability to possession of insider information, even though no pre-existing fiduciary duty or duty to disclose was present. I do not agree. The absence of a fiduciary duty may make insider trading less fraudulent or deceptive; but the *Schreiber* Court recognized the SEC's statutorily derived power to regulate even "nondeceptive activities" if the regulations prescribed "means reasonably designed to prevent" fraudulent, deceptive, or manipulative acts and practices. A rule requiring disclosure of material, nonpublic information before trading in the market cannot be said to fall outside that authority. I conclude that Rule 14e–3 represents a valid exercise by the SEC of a broad congressionally delegated rulemaking authority.

As for the distinction defendants stress between scienter and negligence (a distinction based upon the rule's reference to "know or have reason to know"), in criminal proceedings that concern is met by 15 U.S.C. § 78ff, which provides for criminal liability under the 1934 Act in respect of "any person who willfully violates any provision of this chapter." I agree with Judge Walker in *Chestman, supra* at 458–59, that the government's resulting burden of proving willful misconduct, "which is to say that the defendant was aware of what he was doing, that his acts were done intentionally and deliberately and not as a result of an innocent mistake, negligence or inadvertence", at 459 (a requisite element that will be specifically charged to the jury) overcomes defendants' objections.

Accordingly defendants' motion to dismiss the Williams Act counts is denied.

## IV.

Defendants also move to dismiss the § 10(b) counts, on the ground that the misappropriation theory of insider trading lia-

bility should not be extended to non-corporate insiders like David. Defendants argue from the Supreme Court's evenly divided, 4–4 resolution of *United States v. Carpenter*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) that "the viability of the misappropriation theory" remains undecided. Brief at 22. But defendants also recognize, as they must, that under governing Second Circuit authority this basis for criminal liability is established. *United States v. Newman*, 664 F.2d 12, 16 (2d Cir.1981), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *United States v. Carpenter*, 791 F.2d 1024, 1028 (2d Cir.1986). Defendants at bar move to dismiss these counts in order to preserve the point on appeal. I deny their motion because I am bound by Second Circuit authority to do so. The point is preserved.

## V.

*The Perjury and Obstruction charges against Yagoda.*

■ Finally, Yagoda moves to sever perjury and obstruction charges against him from trial of the conspiracy and securities fraud counts.

In Count Thirty Yagoda is charged with making false statements during the course of a formal SEC investigation into the transactions which underlie the conspiracy and substantive counts. In Count Thirty–One Yagoda is charged with obstructing that SEC investigation by giving false and evasive testimony. These counts are laid under 18 U.S.C. §§ 1621 and 1505 respectively.

Second Circuit law "clearly supports the joinder of underlying substantive crimes with perjury counts where, as here, the false declarations concern the substantive offenses." *United States v. Potamitis, supra*, at 791. Applying that principle in the case at bar, I deny Yagoda's motion to sever these counts. I reject Yagoda's claim of unacceptable prejudice resulting from the trial jury's knowledge "gleaned simply from the reading of the indictment, that the grand jury found probable cause to believe he lied in his SEC testimony." Reply Brief at 11. That objection, if car-

ried to its logical extreme, would foreclose any prosecution for perjury based upon a grand jury's indictment. To the extent that the alleged ambit of the conspiracy and the proof to be elicited by the government may be narrowed or reduced in conformity with this opinion, other concerns expressed by Yagoda may be somewhat allayed. In any event, however, I deny the motion.

### Conclusion

Defendants' motions are denied in part. The government is directed to proceed in conformity with this opinion.

It is SO ORDERED.