**UNITED STATES of America, Appellee,**

v.

**Peter SALAZAR, Appellant.**
**No. 665, Docket 72-1575.**

United States Court of Appeals, Second Circuit.

Argued March 9, 1973.

Decided Sept. 19, 1973.

Robert B. Hemley, Asst. U.S. Atty. (Whitney North Seymour, Jr., U.S. Atty., for the Southern District of New York, and John W. Nields, Jr., Asst. U.S. Atty., on the brief), for appellee.

Michael Young, The Legal Aid Society, New York, N.Y. (Robert Kasanof, New York City, on the brief), for appellant.

Before LUMBARD and MANSFIELD, Circuit Judges, and WYZANSKI, District Judge.*

LUMBARD, Circuit Judge:

Following a four day trial in December 1971 before Judge McLean and a jury, Peter Salazar was convicted and sentenced to fifteen years' imprisonment for participating in a conspiracy to import and distribute large quantities of heroin in violation of 21 U.S.C. §§ 173 and 174.[1] Seeking to have his convic-

---

\* Of the District of Massachusetts, sitting by designation.

1. These sections were repealed October 27, 1970 by Public Law 91–513, effective May 1, 1971.

tion reversed and a new trial granted, Salazar now appeals, urging substantial prejudicial error in the conduct of his trial. Specifically, he asserts that evidence was introduced at trial relating to a second conspiracy not charged in the indictment, that he was denied a reasonable opportunity to prepare his defense, and that serious errors were committed by the prosecution in its summation and by the district judge in his charge to the jury and in his sentencing of appellant. We find these arguments unpersuasive and therefore affirm the conviction and sentence.

## I.

The complex chain of events leading to Salazar's arrest in October 1970 commenced in March 1969. At that time, as developed during trial, Peter Apelien, a New York taxicab driver, who was later to be the government's principal witness, entered into a scheme with his brother-in-law, Alex Pietrini, and several others to smuggle quantities of heroin into the United States from France and Mexico. Later that same month, according to Apelien's testimony, Pietrini and one Jean Caron rendezvoused at the Paris Hotel in Manhattan with Salazar and an associate of his, Angelo Ortiz. At this meeting a sale of twelve kilos of heroin was made to Salazar and Ortiz. After this initial contact, the parties did not all meet again until the second week of April.[2] At this April meeting firm agreement was reached and plans made for the sale of heroin on a regular basis. Under the scheme devised, Pietrini and Caron would supply the narcotics, sending them by courier to the United States. Apelien, serving as an intermediary, would then contact Salazar and

Ortiz, the purchasers, informing them where and when they could obtain the contraband. At the designated time and location Salazar or Ortiz would make contact with the courier, who was to be readily indentifiable by the necktie he would be wearing.

Not long after the conspiracy was put into effect, however, Ortiz expressed his dissatisfaction to Apelien. At a meeting in May 1969 he complained that he had been taking all the risks and that Salazar was unable to sell heroin on his own. After some discussion and a trip to France by Apelien, an understanding was arrived at whereby five kilos per week would be shipped through Apelien to Ortiz apparently without Salazar's knowledge. Consistent with this arrangement, numerous sales were made to Ortiz in subsequent weeks during the months of July and August.[3] In the third week of August, however, Apelien found it impossible to locate Ortiz and promptly contacted Salazar in Miami.[4] Appellant readily agreed to fly to New York the next day to purchase Apelien's supply of heroin. That same evening Ortiz contacted Apelien,[5] whom he found to be quite worried, apparently concerned that Salazar would discover that sales had been made without his knowledge. Ortiz reassured him that Salazar could be kept in the dark and, indeed, the next day a sale was transacted with Salazar still believing Ortiz to be a loyal associate.

According to Apelien's testimony, a number of sales directly to Ortiz followed this August sale. The last of these occurred in April 1970. But after agreeing to take a shipment of narcotics, Ortiz communicated to Apelien the difficulties he was encountering in making a

2. In the first week of April a meeting was held without Salazar. However, no heroin was sold and no firm agreement reached.

3. During this period Apelien agreed with a courier, Jean Audisio, to strike out on their own rather than rely on Pietrini, Caron, and an individual known as Homere Filippe for their supply of narcotics. It is unclear, however, how long this arrangement contin-

ued since the record does reveal subsequent deliveries to Apelien from Pietrini, Caron, and Filippe.

4. Pietrini had earlier written Salazar's Miami telephone number on the backs of two paintings in Apelien's apartment.

5. Ortiz had been grounded in Puerto Rico by a hurricane.

sale. He informed Apelien that if he could not make a sale very soon, he would call Salazar, presumably to see whether he could arrange a deal. The next day, before Ortiz could take any further steps to dispose of the drugs, he was arrested. Apelien immediately telephoned Salazar and told him to return to New York. Meeting in New York, the two discussed Ortiz's arrest and then Salazar asked Apelien whether he could get any more shipments of heroin. The next day a six kilo shipment arrived by two couriers. Before a transaction between Salazar and Apelien could be completed, however, the couriers were arrested. Shortly thereafter Apelien was arrested in France and on October 5 Salazar was arrested in New York. In the interim between Salazar's arrest and trial, Apelien returned to the United States, and, facing criminal charges, agreed to serve as a prosecution witness in the Salazar trial. Ortiz, who was to be tried as a coconspirator with Salazar, pled guilty the day before trial and was later sentenced to ten years' imprisonment. Tried alone, Salazar maintained that his only dealings with the alleged conspirators concerned the numbers game and not heroin. His defense consisted entirely of his own uncorroborated testimony.

## II.

■ We first consider Salazar's argument that testimony relating to twelve Apelien-Ortiz transactions of which he had no knowledge should not have been permitted in evidence.[6] The basis for this argument is Salazar's view that these transactions were acts in furtherance of a second conspiracy, wholly independent from the single conspiracy charged in the indictment. Were this in fact the case, Salazar would be correct in asserting that the trial judge should have excluded this testimony or, at a minimum, have instructed the jury to disregard acts in furtherance of the second conspiracy, for which the appellant had not been indicted. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Borelli, 336 F.2d 376 (2d Cir. 1964).[7]

■ We are, however, unable to endorse this "multiple conspiracies" view of the events of March 1969 to April 1970. While it is true that the appellant was not aware of all the activities of his coconspirators, this, in itself, does not suffice to excuse him from criminal liability for their activities in furtherance of the conspiracy. United States v. Cirillo, 468 F.2d 1233 (2d Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).[8] It is true that a conspirator may not be held responsible for acts beyond the scope of the agreement. United States v. Crimmins, 123 F.2d 271, 273 (2d Cir. 1941). However, according to the testimony at trial, the activities engaged in by Ortiz and Apelien were entirely within the scope of the agreement reached by all parties, including Salazar, in April 1969. Their object was precisely the same—the importation and distribution of large quantities of heroin. Moreover, their scheme employed the same modus operandi, with identical suppliers, couriers, and the same intermediary. The mere fact that they chose to bypass the appellant on certain transactions, and, in effect, deprive him of his share of illegal profits, hardly alters our conclusion that these activities were entirely consonant with and in furtherance of the original con-

---

6. Apelien testified to four meetings in which he claimed Salazar had participated.

7. *See generally*, Note, Developments in the Law of Criminal Conspiracy, 72 Harv.L.Rev. 920 (1959); Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387 (1957).

8. In the *Cirillo* case, the receiver of large quantities of smuggled drugs claimed that he was entirely unaware of efforts by his suppliers to send a shipment to him. Nevertheless, the court permitted the introduction of evidence relating to the suppliers' efforts, although unknown to the receiver-defendant, since the defendant had entered into an open-ended agreement with the suppliers to receive drugs.

spiracy in which the appellant was a participant. Furthermore, on several occasions, Apelien, unable to contact Ortiz, turned to Salazar. On each of these occasions the appellant, without hesitation, agreed to purchase the heroin. Far from suggesting "multiple conspiracies," these actions, considered along with the sameness of suppliers, couriers, and intermediary, point to a single "chain" conspiracy in which Salazar and Ortiz served as principal buyers. United States v. Cirillo, *supra*. *See also* United States v. Bruno, 105 F.2d 921 (2d Cir. 1939).[9]

### III.

Salazar also argues that he was denied a reasonable opportunity to prepare for trial, in violation of his constitutional rights to effective assistance of counsel, confrontation, and due process. Specifically, he points to serious inadequacies in his indictment, the failure of the government to file a complete bill of particulars on time, and the refusal of the district judge to grant an adjournment although the bill of particulars was delivered only four days before trial.

Salazar's assertion that the indictment was inadequate because of its brevity and its "conclusory" tracking of the statute alleged to have been violated is without merit. It has long been settled that an indictment is adequate so long as it contains the elements of the offense, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); United States v. Palmiotti, 254 F.2d 491 (2d Cir. 1955). Under this test we have consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms. United States v. Fortunato, 402 F.2d 79, 82 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); United States v. Palmiotti, 254 F.2d 491, 495 (2d Cir. 1958); United States v. Varlack, 225 F.2d 665, 669–670 (2d Cir. 1955).

Salazar also argues that the trial judge committed reversible error in refusing to grant motions for adjournment made by appellant after the government failed to file a bill of particulars on time. The particulars were not filed until December 13, 1971, ten days after the date ordered by the district judge. Even then they were incomplete.[10] Not until December 16, four days before trial, did the appellant receive all the information which the government had been ordered to provide. Salazar maintains that this four day period before trial was insufficient to "investigate" thoroughly the more than eighty "contacts" reported in the government particulars.

A bill of particulars is normally ordered by a trial judge, as in the present case, to supplement an indictment cast in general terms. However, a judge is not required to grant such an order. Whether a bill of particulars

---

9. Appellant's reliance on Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is misplaced. That case, unlike the present one, involved a "spoke" conspiracy. In addition to *Kotteakos*, Salazar cites United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), for the proposition that a defendant "who has not participated in all phases of the conspiracy [is] entitled to an instruction that [he can] be held accountable only for the particular agreements in which [he has] participated." While this proposition may apply to an outsider who happens to make a limited number of purchases from an ongoing highly organized conspiracy, it would hardly apply, as *Borelli* itself recognized, to the "core" members of that conspiracy.

10. It is unclear whether Judge McLean actually considered the December 13 particulars incomplete. In a quite literal sense the government did comply with the court order to "specify the approximate time and place of each meeting or conversation between the defendants or between a defendant and an alleged co-conspirator during the period covered by the indictment." However, a fair reading of the order suggests that the judge intended that the government be as precise as possible rather than as vague as it in fact was in the information it produced.

should be provided at all, its scope and specificity, if permitted, and the time allowed a defendant to consider the information in preparation of his defense, are all matters left primarily within the discretion of the trial judge. United States v. Bentvena, 193 F.Supp. 485, 498–499 (S.D.N.Y.1960); United States v. Bonanno, 177 F.Supp. 106, 119 (S.D. N.Y.1959). *See also* United States v. Andrews, 381 F.2d 377 (2d Cir. 1967), cert. denied, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968). Similar broad discretion is left to the trial judge in granting an adjournment. *See* United States v. Bonanno, *supra*, 177 F.Supp. at 121. In light of these well-established and oft-stated principles, we do not consider the delay in delivery of the bill of particulars until four days before trial and the refusal of the trial judge to grant an adjournment reversible error. United States v. Pellegrino, 273 F.2d 570 (2d Cir. 1960).

█ Moreover, the record does not show, and appellant has failed to establish, that the information contained in the particulars could not have been adequately reviewed in the four days before trial or, in fact, that this information was vital to the defense that Salazar made. The initial bill of particulars delivered December 13 consisted of a list of eighty dates on which meetings or conversations among conspirators were alleged to have taken place. The additional information supplied by the government on December 16 detailed as specifically as possible the time and location of these contacts and the participation, if any, of Salazar and Ortiz. We are not persuaded that the period between the delivery of these bills of particulars and the trial was not ample for appellant to consider the information provided and to obtain from it a clear picture of the essential facts of the crime charged and the broad outlines of the government's case. It may be true, as Salazar contends, that he did not have an opportunity to "investigate" fully the eighty contacts enumerated. But the principal function of a bill of particulars is to apprise a defendant of the essential facts of the crime for which he has been indicted, especially in instances where the indictment itself does little more than track the language of the statute allegedly violated. *See* United States v. Russo, 260 F.2d 849 (2d Cir. 1958); United States v. Bonanno, *supra*, 177 F. Supp. at 119. Four days were more than adequate for appellant, Salazar, to be apprised of these essential facts.[11]

But even if it were conceded that Salazar lacked adequate opportunity to review the government bill of particulars, we would still be disposed to reject his claim that he was so substantially prejudiced as to require a reversal of conviction and a new trial. In contrast to the government's case, which included the testimony of two coconspirators and numerous other witnesses, Salazar offered only his own uncorroborated testimony. His defense, in substance, consisted simply of flat denials that he had been engaged in heroin smuggling and unsubstantiated assertions that his only contacts with Apelien and Ortiz had been in connection with the numbers game. Furthermore he admitted participation in most of the meetings with Apelien and Ortiz and at no time during trial did he claim that he needed more time to locate or call any witness or produce any evidence in support of his defense. In light of this trial record, it is reasonable to conclude that Judge McLean's denial of Salazar's motion for a delay of the trial was not an abuse of discretion.

Of course, our holding should not be construed to condone or excuse the failure of the government to comply with

---

11. Cases cited by the appellant in support of his position are inapposite. They involve the markedly different situation in which defendants were compelled to go to trial without counsel or first obtained counsel only minutes, hours, or several days before trial. *E. g.*, Willis v. Hunter, 166 F.2d 721 (10th Cir. 1948); Fields v. Peyton, 375 F.2d 624 (4th Cir. 1967). Salazar also cites Bastida v. Braniff, 444 F.2d 396 (5th Cir. 1971). In that case, a transcript of a suppression hearing was not made available to the defense counsel until shortly before the trial commenced.

the court's order to furnish particulars by a certain date. The record discloses no good reason for the government's recalcitrance. Under the circumstances, the trial judge might have been well advised to impose suitable sanctions against the government or grant an adjournment of the trial date or both. Nevertheless, we do not find that Salazar's opportunity to present his defense was so seriously prejudiced that a new trial is required. In another case, however, where the possibilities of prejudice are greater and the defense interposed raises a more serious question of guilt than is here the case, the only suitable remedy would be a reversal of the conviction and a new trial.

## IV.

Salazar claims additionally that an admission he made shortly after arrest to the effect that he knew Apelien and Ortiz should not have been admitted in evidence. The basis for his claim is that the prosecution initially stated it would not introduce such admissions at trial and that it informed appellant of a change in this policy only shortly before trial. He sets forth a similar argument with regard to physical evidence introduced at trial. In a hearing at trial, Judge McLean denied a motion to suppress Salazar's admission. In light of the fact that the admission was properly obtained, that the appellant acknowledged its truth at trial, and that he was aware before trial that the prosecution intended to introduce it in evidence, we fail to find any error. Similarly, we fail to find error in the refusal of the court to permit the pretrial inspection by appellant of heroin which had been seized from a courier.[12] United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969); Beatty v. United States, 377 F.2d 181, 185 (5th Cir.), reversed on other grounds, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967).

## V.

Salazar also claims error by the district judge in failing to charge the jury that Apelien's testimony may have been given under a promise of immunity and in limiting appellant's summation to forty-five minutes. In addition, he argues that the government's summation was improper and prejudicial. All three of these contentions are without merit. The court's charge to the jury was entirely adequate, with great care taken by the trial judge to impress upon the jury the "searching scrutiny" that must be given accomplice testimony. The judge was not required to speculate about the possibility that Apelien may have testified under a promise of immunity.[13] No evidence of such a promise had been introduced at trial and indeed, the witness had expressly denied under oath that he had been promised any sort of consideration.[14] Similarly, the judge was entirely within his discretion in limiting appellant's summation to forty-five minutes, the same time allotted the government, rather than the requested one hour and fifteen minutes. United States v. Kay, 101 F.2d 270, 272 (2d Cir.), cert. denied, 306 U.S. 660, 59 S.Ct. 789, 83 L.Ed. 1056 (1939).

With regard to the government's summation, Salazar argues, first, that it was improper for the prosecutor to comment on his description of the numbers game. Salazar contends, in addition, that the prosecutor committed error in suggesting that he had a greater motive to lie than Apelien. Finally, he asserts that it was error for the prosecutor to suggest

---

12. The court had ordered that appellant be permitted to inspect all items seized from him or from Ortiz.

13. For similar reasons, there was no error in the trial judge's failure to charge the jury that it consider whether the testimony of another government witness, Luciano Carbal-

lo, had been given under a promise of immunity or other consideration.

14. Moreover, the jury had been fully apprised of the possibility that Apelien may have been promised immunity by the defense counsel during his cross-examination of the witness and during his summation.

that Carballo, a courier, had not motive to lie and was therefore a credible witness.

 These arguments are without substance. It was quite proper for the prosecutor to comment on Salazar's testimony regarding the numbers game. Indeed, appellant had made this the keystone of his defense, maintaining that his contacts with Apelien and Ortiz concerned numbers and not heroin. Similarly, no prejudicial error was committed by the prosecutor in suggesting that, as between Salazar and Apelien, the former had the greater motive to lie and was thus the less credible witness. While it is improper for a prosecutor to assert his personal belief as to the guilt of a defendant, United States v. Murphy, 374 F.2d 651 (2d Cir.), cert. denied, 389 U.S. 836, 88 S.Ct. 47, 19 L.Ed. 2d 98 (1967), ABA Minimum Standards for Criminal Justice Project, The Prosecution and the Defense Function § 5.-8(b) (Tent.Draft 1970), he may comment on a defendant's credibility as a witness. See Reagan v. United States, 157 U.S. 301, 306, 15 S.Ct. 610, 39 L.Ed. 709 (1895); Dyson v. United States, 283 F. 2d 636 (9th Cir.), cert. denied, 366 U.S. 974, 81 S.Ct. 1944, 6 L.Ed.2d 1264 (1960); United States v. Odom, 348 F. Supp. 889 (M.D.Pa.1972). Finally, the prosecutor's statements that Carballo was "clean" and had no motive to lie do not constitute reversible error. Not until the jury had retired to deliberate following the judge's charge did counsel for appellant request that it be informed that Carballo might be facing deportation and prosecution in France. No evidence was offered in support of these allegations.[15] The judge acted within his discretion in determining not to reopen the case for argument regarding matters affecting the credibility of a witness.

## VI.

 Appellant's final argument is that the trial judge committed serious errors in sentencing him. First, he asserts that the judge should have considered whether he was eligible for commitment pursuant to 18 U.S.C. § 4251 et seq. This statute provides, as an alternative to sentencing, drug rehabilitation for addicts convicted of various federal offenses. However, 18 U.S.C. § 4251(f) (2) specifically excepts from eligibility those offenders who are convicted of unlawfully importing or selling or conspiring to import or sell a narcotic drug, unless the court determines that such sale was for the primary purpose of enabling the offender to obtain a narcotic drug which he requires for his personal use because of his addiction to such drug.

Since it is clear from the record that appellant participated in a conspiracy to import and sell large quantities of drugs, and did not do so for the primary purpose of obtaining narcotics for his personal use, we see no basis for disturbing the sentence imposed by the district court.

 Appellant also asserts that the trial judge imposed a heavier sentence on him than on Ortiz because he chose to stand trial rather than plead guilty. In support, he quotes the judge's statement at sentencing:

> This is a very serious case, very large narcotics conspiracy, and this man stood trial and he had a fair trial, as far as I know, according to the best of my ability. He was convicted by a jury.

We see no basis for Salazar's interpretation of this statement. Moreover, the mere fact that he received a harsher

---

15. The prosecuting attorney's comments were based on evidence at trial that Carballo had completed serving his prison sentence for participation in the conspiracy. There is no evidence that the prosecution was aware of any charges which the witness might be facing.

sentence than Ortiz does not require our vacating his sentence. United States v. Stidham, 459 F.2d 297 (10th Cir. 1972); Hart v. Henderson, 449 F.2d 183 (5th Cir. 1971).

Affirmed.