**UNITED STATES of America,**

v.

**James M. GABRIEL and Gerard E. Vitti, Defendants.**

**No. 95 CR 0108 (JSR).**

United States District Court, S.D. New York, White Plains Division.

March 27, 1996.

R. Stan Mortenson, Cynthia Thomas Calvert, Barry J. Pollack, Miller Cassidy Lavvoca & Lewin, Washington, DC, for Defendant Gabriel.

Thomas Fitzpatrick, Patricia Moran, New York City, for Defendant Vitti.

Seth Farber, Elliott Jacobson, White Plains, NY, for the United States.

---

## OPINION AND ORDER

RAKOFF, District Judge. .

The pre-trial motions in this case raise important issues regarding the scope of 18 U.S.C. § 1512 and the application of *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

A third superseding indictment (the "Indictment") charges defendants Gabriel and Vitti, two former executives of the Chromalloy American Corporation, with multiple counts of conspiracy, fraud, false statements and obstruction of justice, in providing commercial airlines with defectively-repaired engine parts and concealing these defects from customers and regulators. Defendants moved to dismiss Counts 4–11 and 13–18 of the Indictment. The Government stipulated to the dismissal of Counts 10 and 11, but otherwise opposed. The motions have been well and extensively briefed, and several of them were the subject of oral argument before Judge Parker prior to the reassignment of the case to this Court earlier this month.

After reviewing the parties'. submissions and the transcript of the oral argument, this Court held a four-hour hearing on March 15, 1996, at the end of which the Court denied the motions to dismiss Counts 4–5, 7–9, and 13–18, but reserved as to Count Six. Following further written submissions, the Court, on March 19, 1996, telephonically granted the motion to dismiss Count Six. This opinion confirms these prior oral orders and elucidates their rationales.

*I. The Scope of 18 U.S.C. § 1512 (re: Count Five)*

Count Five of the Indictment, which charges defendant Gabriel with violation of 18 U.S.C. §§ 1512 and 2, consists of two paragraphs. The first (¶ 37) incorporates by reference the initial 23 paragraphs of the Indictment, which describe a scheme to provide Qantas Airways with a defectively-repaired engine part called an LPT case. The second (¶ 38) reads in its entirety: "On or about January 27, 1993, in the Southern District of New York and elsewhere, JAMES M. GABRIEL, the defendant, corruptly persuaded another person, and attempted to do so, and engaged in misleading conduct toward another person with intent to influence, delay, and prevent the testimony of a person in an official proceeding, to wit, at a time when he was aware of the existence of a grand jury investigation concerning Chromalloy–Orangeburg's repair practices, GABRIEL corruptly sent a facsimile transmission concerning the repair of the Qantas LPT case to Donald Mealing, in order, among other things, to induce Mealing to provide false testimony to a grand jury."

The facsimile transmission referred to in Count Six is a one-page document sent from defendant Gabriel in the Southern District of New York to Mr. Mealing in Australia on the subject of the "Ongoing Govt. Investigation." In pertinent part, it states that:

I am going to call you with our attorneys within the next several days.... The questions they will ask you are relative to your memory of our meeting in Syd at QF covering acceptance criteria and the very nature of this case that it was difficult to salvage. It is important that you think this through before they talk on the issue. Note I've cited the case had bad sulfidation, local thinning, required multiple processing ... (reason for late delivery) and was previously repaired by another facility. All of these points supported the case was a 'dog' but we shipped it as partially serviceable....[1]

The Government has indicated that its proof in support of Count Five will largely consist of evidence that the excuses for the defective repair cited in the foregoing quotation were, as Gabriel knew, false or misleading, giving rise to the inference that Gabriel was endeavoring to get Mealing to adopt a false account.

In his motion to dismiss Count Five, Gabriel contends that the foregoing allegations are insufficient to state a violation of 18 U.S.C. § 1512,[2] because (A) they fail to provide an adequate "nexus" between the facsimile transmission and any "official proceeding," and (B) they fail to allege adequately an endeavor to "corruptly persuade" or to "engage in misleading conduct toward another person." We consider each point in turn.

(A) In support of his first argument, Gabriel relies primarily on the Supreme Court's recent decision in *United States v. Aguilar,* — U.S. ——, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). In *Aguilar,* the Court considered the so-called "Omnibus Clause" of an older obstruction statute, 18 U.S.C. § 1503, which prohibits any "endeavor[ ] to influence, obstruct, or impede, the due administration of justice...." Recognizing the need to place "metes and bounds on [this] very broad language," the Court construed "endeavor" to include both a subjective and objective component. Subjectively, "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the Court's or grand jury's authority." *Aguilar,* — U.S.

---

**1.** Neither party challenges the right of the Court, in assessing the legal sufficiency of Count Five, to take notice of the text of the facsimile transmission expressly referred to in that count. *Cf. San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos,* 75 F.3d 801, 808–09 (2d Cir.1996) (in assessing legal sufficiency of civil complaint, court can consider full text of documents relied on in the complaint.) Even without reference to the text of the transmission, however, this Court's ruling would be the same.

**2.** Subsection (b) of § 1512, on which Count Five is premised, provides in pertinent part: "Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding ... [is guilty of a crime]."

at ——, 115 S.Ct. at 2362 (citing *United States v. Brown,* 688 F.2d 596, 598 (9th Cir. 1982)). Objectively "the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* (citing *United States v. Wood,* 6 F.3d 692, 696 (10th Cir.1993)). Since defendant Aguilar's alleged violation of the Omnibus Clause consisted of making false statements to an FBI investigator who had neither been subpoenaed nor otherwise directed to appear before the grand jury, and whose likely such appearance was ·purely speculative, it failed to meet either of these requirements. *Id.* at ——, 115 S.Ct. at 2366.

Arguing that § 1512 is closely linked to § 1503, Gabriel contends that a similar "nexus" requirement should be read by implication into § 1512, and contends further that, if this is done, Count Six must fall, since there is nothing in the count to suggest that Mealing, an Australian resident at the time, could or would be called before the grand jury. Even if we were persuaded, however, to transport *Aguilar's* "nexus" requirement from its anchor in § 1503 to a new mooring in § 1512, we would be disinclined to dismiss Count Five: for there is nothing in *Aguilar* (a post-conviction case) that requires that the requisite "nexus" be pleaded on the face of the indictment, in derogation of the hoary doctrine that an indictment that does little more than track the language of the statute is sufficient. *See Hamling v. United States,* 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Palmiotti,* 254 F.2d 491, 495 (2d Cir.1958).

Moreover, even if we were to take notice of Gabriel's allegation that Mealing was a resident of Australia at the time of the facsimile· transmission in question and therefore not immediately amendable to grand jury subpoena power, we would likewise need to take cognizance of the Government's counter-allegation that Mealing was a key eyewitness to the underlying events, rendering it "natural and probable," and entirely foreseeable, that the grand jury would ultimately seek his testimony (as in fact it did). In such circum-

stances, a determination of whether an adequate "nexus" has been proven might best be left to the ·trier of fact or, at the least, reserved until a full evidentiary record has been developed (as in *Aguilar* itself).

▮ But we need not enter this thorny thicket, for we are unpersuaded that the "nexus" requirement of § 1503, as elaborated in *Aguilar,* can be imported to § 1512. By contrast with § 1503, with its nineteenth-century roots and spare and indefinite language, § 1512, enacted in 1982, is a detailed statute in which Congress expressly sought to resolve or supplant many of the uncertainties and· judicially-implied limitations that had arisen under § 1503 and its predecessors.

For example, whereas § 1503 had been limited by construction to judicial proceedings, *e.g., United States v. Fayer,* 573 F.2d 741, 745 (2d Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978), § 1512 expressly extends to obstruction designed to "hinder, delay or prevent the communication to a law enforcement officer ... of the United States of information relating to the commission or possible commission of a Federal offense...." *See* § 1512(b)(3). Related issues that have plagued enforcement under § 1503 are likewise resolved in § 1512 by such provisions as that: "an official proceeding need not be pending or about to be instituted at the time of the offense," (§ 1512(e)(1)); that "no state of mind need be proved with respect to the circumstance ... that the official proceeding before a judge, court, magistrate, grand jury, or government agency is before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a Federal grand jury, or a Federal Government agency," (§ 1512(f)(1)); and that "[t]here is extraterritorial Federal jurisdiction over an offense under this section," (§ 1512(g)).

▮ In each of these, as in other, provisions of § 1512, Congress has expressly settled issues arising under older and vaguer obstruction statutes like § 1503. In each instance, it has done so in a manner favoring the broadest reach of the statute. Accordingly, no warrant exists for judicially implying in § 1512 a narrowing "nexus" require-

ment that finds no expression in the plain language of the statute itself. To impose order on chaos, as the Court did in *Aguilar*, is a necessary judicial function; but breadth is not the same as uncertainty, and where Congress speaks with reasonable precision, as in § 1512, to restrict the stated scope of the statute is not within the power of a court.

■ (B) Alternatively, Gabriel argues that Count Five must be dismissed "because it is bereft of any facts indicating *either* that Mr. Gabriel 'corruptly persuade[d]' *or* engaged in 'misleading conduct toward' Donald Mealing" (Defendant Gabriel's Memorandum in Support of Motion to Dismiss Count Five, at p. 11)—those being the alternative violations alleged in Count Five. The short answer is that the Government is not required to plead such evidence in an indictment. *See Hamling*, 418 U.S. at 117–18, 94 S.Ct. at 2907–08; *Salazar*, 485 F.2d at 1277; *Palmiotti*, 254 F.2d at 495; *see also* Fed.R.Crim.P. 7(c)(1). Indeed, neither of the cases on which Gabriel primarily relies for this argument—*United States v. Poindexter*, 951 F.2d 369 (D.C.Cir. 1991), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992); *United States v. King*, 762 F.2d 232 (2d Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1203, 89 L.Ed.2d 316 (1986)—involved a facial challenge to an indictment, but rather concerned post-conviction relief where the court had the benefit of a fully developed record.

Since, however, the issues Gabriel advances in connection with this argument are likely to arise again during the course of trial (scheduled to commence April 1, 1996), it is provident to address his theories at this time. Relying on the D.C. Circuit's opinion in *Poindexter*, *supra*, Gabriel argues that "corruptly persuades" requires a showing that the defendant endeavored to persuade another to violate a legal duty and that the defendant used threats or force to try to achieve this goal. Here, by contrast, he argues, Mealing, as an Australian resident, had no legal duty to testify before a United States grand jury and was not the subject of either threats or force but only a facsimile transmission.

However, the divided panel in *Poindexter*—which was construing, not § 1512, but the broader catchall language of still another obstruction statute, 18 U.S.C. § 1505—premised its requirements on the belief that, without some such limitations, the statutory requirement that the defendant act "corruptly" would be unconstitutionally vague. *Poindexter*, 951 F.2d at 384–86. This line of thought, seemingly at odds with the D.C. Circuit's own prior opinion in *United States v. North*, 910 F.2d 843, 881–82 (D.C.Cir.1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), has been rejected in the Second Circuit, with particular reference to § 1512. Specifically, in *United States v. Thompson*, 76 F.3d 442 (2d Cir.1996), the Court of Appeals held that the term "corruptly" as employed in § 1512(b) requires only that the Government prove "that the defendant's attempts to persuade were motivated by an improper purpose." *Id.*, 76 F.3d at 452. Such purpose, however, is sufficient to save § 1512(b) from any unconstitutional vagueness. *Id.*

As to "misleading conduct," Gabriel argues that the facsimile was, at worst, an invitation to lie, rather than an attempt to mislead, and therefore within the holding of *King, supra*, where the Court of Appeals held that this provision of § 1512 does not reach a situation where one conspirator suborns another to lie before a grand jury by telling a story both conspirators know is false and exculpatory. *King*, 762 F.2d at 237. Far more applicable, however, is *United States v. Rodolitz*, 786 F.2d 77 (2d Cir.1986), *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986), decided only months after *King*, in which the Court of Appeals, distinguishing *King*, stated that:

> The most obvious example of a § 1512 violation may be the situation where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it before the grand jury.... In giving the statutory language its fair meaning, the court must find that making false statements to convince another to lie falls squarely within the definition of "engaging in misleading conduct toward another person" under section 1512.

*Rodolitz,* 786 F.2d at 81–82. This fits Count Five like a glove.

Accordingly, for the foregoing reasons, Gabriel's motion to dismiss Count Five is denied.

## II. The Pre–Trial Applicability of Grunewald (re: Count Six)

Charging with the insistence of General Pickett and the abandon of a teen-age credit card holder, the Indictment includes among its 18 counts no fewer than three conspiracy counts, relating, respectively, to the improper repair of the Qantas LPT case (Count 1), the improper welding of bearing seals (Count 6), and the improper coating of vanes and blades (Count 12). Both defendants have moved to dismiss Count Six on the ground that it is barred by the applicable five-year statute of limitations.

On its face, Count Six appears open to two readings. The broad, conclusory language of the "boilerplate" paragraphs of the count (¶¶ 53–57) posits a unified conspiracy lasting from 1985 through 1991, the objects of which were to defraud Chromalloy's customers by misrepresenting the materials used in the welding of repaired bearing seals (¶ 55), to prevent the Federal Aviation Administration ("FAA") from learning of these substandard repairs by making false entries in the Chromalloy documents subject to FAA inspection (¶¶ 54, 57), and to mislead Air India and other customers from demanding restitution and canceling future contracts after they found evidence of the defective repairs (¶ 56). But the other 15 paragraphs of the count, (¶¶ 39–52, 58), as well as the few particulars in the boilerplate paragraphs, are more consistent with an allegation of two conspiracies: an initial 1985–1989 conspiracy by Gabriel and other, unnamed conspirators to deceive Chromalloy's customers and the FAA into believing that proper welding had been done, and, after Air India and others discovered this was untrue, a subsequent 1990–1991 conspiracy between Gabriel and Vitti to limit the company's liability by deceiving Chromalloy's customers into believing that the defects were unintentional and of modest scope.

As to the first conspiracy, paragraphs 43 through 46 of the Indictment describe in some detail how defendant Gabriel, beginning in April, 1986 and continuing until November, 1989, directed Chromalloy subordinates to use improper materials in the welding of bearing seals and to prepare fraudulent packing slips designed to mislead customers and inspectors into believing that proper repairs had been made. In August, 1989, however, a number of the bearing seals failed during testing at Air India's facilities in India (¶ 47). Air India and the manufacturer of the airplane part, Pratt Whitney, commenced an investigation that "revealed, among other things, that the failed Air India bearing seals had been repaired with Hastelloy W [an allegedly cheaper, softer material] instead of the required Inco 901 and that the improper substitution of the Hastelloy W caused the failures." (¶ 48). While Gabriel and an unnamed co-conspirator tried to keep the scheme afloat by backdating a revealing document (¶ 48), by November, 1989, the improper welding was discontinued. (¶ 45). Thus, although the Indictment does not say so *in haec verba,* its factual allegations make evident that the first conspiracy had ended.

Defendant, Vitti, who did not join Chromalloy until January, 1990 (¶ 5), was not involved in any of this. But after Vitti joined the company, he and Gabriel "agreed that disclosure of the full extent of the improper repairs would cause Chromalloy–Orangeburg to suffer extensive negative publicity, huge potential civil liability, and possible FAA sanctions. They, therefore, agreed to conceal the true extent of the improper substitution of Hastelloy W for Inco 901 and A–286." (¶ 49). In essence, this is a clear allegation of a new and separate conspiracy—different in impetus, duration, personnel and purpose from the original conspiracy and founded on a desire to minimize the company's potential liabilities by concealing the full extent of the original conspiracy in which Vitti played no part. In furtherance of this agreement, Vitti, in late 1990 and early 1991, made numerous false representations to Air India designed to contain the expanding investigation. (¶¶ 50–51).

Thus, the Indictment on its face effectively alleges two distinct conspiracies. This reading is reinforced by the listing in Count Six

of the alleged conspiracy's eight overt acts (¶ 58), for they readily divide into four earlier acts taken at Gabriel's behest to further the initial scheme to defraud and four later acts taken by Vitti to try to cover up the now-discontinued scheme.

Specifically, overt acts "a" and "b" refer to the directions given by Gabriel in 1985 and 1986 to use the allegedly inferior Hastelloy W material in repairing the bearing seals, and overt act "c" specifies that hundreds of bearing seals were thereby improperly welded between 1986 through November, 1989. Overt act "d" specifies the direction given by Gabriel in August, 1989 (after the initial discoveries by Air India but before the improper welding had been terminated), directing the backdating of a Chromalloy specification in order to prevent Pratt and the FAA from delving further into the fraud and bringing it to a close. (¶¶ 48, 58).

By contrast, acts "e" through "h" are alleged to have occurred after the termination of the improper welding in November, 1989, and to have consisted of the efforts made in 1990–1991 by the new player, Vitti, to limit the damage from the emerging Air India and Pratt enquiries by concealing the scope and nature of the fraud in written and oral communications with Air India. (¶ 58).

The substantive counts of the Indictment (Counts 7–11) that are premised on the allegations set forth in Count Six are likewise more consistent with two conspiracies than with one. Thus, Count Seven, a substantive mail fraud count embracing the improper welding fraud, alleges a scheme lasting from 1985 through only February, 1990, and names Gabriel as the sole defendant. By contrast, Count Eight, embracing the cover-up scheme, is alleged to have begun only in August, 1989, and to have lasted until March, 1991, and names both defendants.

While Count Nine, a false statement count naming both defendants and covering a period from 1986 through 1992, at first seems an exception to this analysis, on careful scrutiny it proves otherwise. When read in conjunction with the paragraphs from Count Six that Count Nine expressly incorporates by reference, Count Nine alleges that the false statements consisted of documents (notably packing slips) and entries prepared at the direction of Gabriel and unnamed others during the 1988–1989 period in conjunction with the improper welding scheme. By contrast, Vitti's liability under Count Nine stems from his and Gabriel's permitting such documents to be "maintained" in Chromalloy's files (and therefore to continue to be subject to FAA inspection) in the 1990–1991 cover-up period. (*See* ¶¶ 46, 52, 64.)

Finally, Counts Ten and Eleven charge defendant Vitti with Misprision of Felony and Accessory After The Fact for having taken steps as early as January, 1990 to help conceal the prior fraudulent scheme perpetrated by Gabriel. While these counts have now been dismissed on consent, their inclusion in the Indictment was necessarily premised on a theory of the underlying facts more consistent with the notion of two conspiracies than one, to wit: an underlying Gabriel welding fraud conspiracy terminated in late 1989 as a result of growing exposure, and a Gabriel/Vitti cover-up conspiracy undertaken in 1990–1991 in direct response to that exposure and in an effort to minimize new liabilities resulting therefrom.

■ In sum, this Court finds that Count Six, on any but a superficial reading, appears to actually allege two distinct conspiracies and thus to offend the prohibition against combining multiple conspiracies within a single conspiracy count. *E.g., United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992); *United States v. Beech–Nut Nutrition Corp.,* 659 F.Supp. 1487, 1492 (E.D.N.Y.1987); *United States v. Payden,* 613 F.Supp. 800, 808 (S.D.N.Y.1985); *see also* Fed.R.Crim.P. 8(a). Accordingly, if it were within the power of the Court to do, this Court would dismiss Count Six for duplicity—and, indeed, defendant Vitti has so moved. But the Court of Appeals has repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact "singularly" well suited to determination by a jury. *E.g., United States v. Johansen,* 56 F.3d 347, 350 (2d Cir.1995); *United States v. Maldonado–Rivera,* 922 F.2d 934, 962 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991); *United States v. Potamitis,* 739 F.2d 784, 787 (2d Cir.), *cert.*

*denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984). Given Count Six's boilerplate allegations of a single conspiracy, the Court cannot conclude on the basis of the pleadings alone that there is *no* set of facts falling within the scope of Count Six that could warrant a reasonable jury in finding a single conspiracy.

Since, however, the primary ground on which the defendants move to dismiss Count Six is not multiple conspiracies but statute of limitations, there is more to be considered, both factually and legally. Factually, the Court can not blind itself to the fact that Count Six of the original indictment in this case, filed in February, 1995, named only Gabriel as a defendant and alleged only the four overt acts, "a" through "d" (¶ 58), that occurred prior to 1990. For this reason, as the Government concedes, Count Six of the original indictment was barred by the applicable five-year statute of limitations. Accordingly, in April, 1995, the Government attempted to save Count Six by filing a first superseding indictment (essentially identical to the instant Indictment so far as Count Six is concerned) that enlarged the allegations to include the Vitti cover-up activities of 1990–91. Legally, this attempt to extend the length of a conspiracy to avoid a statute of limitations bar directly implicates the doctrine of *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

In *Grunewald,* the Court held that "the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied upon as an overt act may properly be regarded in furtherance of the conspiracy." *Id.* at 397, 77 S.Ct. at 970. In determining this scope, the Court held, "attempts to cover up after the crime begins to come to light" cannot alone serve to extend the period of the conspiracy. *Id.* at 403, 77 S.Ct. at 973. This is because "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." *Id.* at 402, 77 S.Ct. at 972.

Viewed by these standards, the relevant inquiry becomes not so much whether Count Six represents a strained attempt to bind two conspiracies together through conclusory language of unity as whether it constitutes an impermissible attempt to save an otherwise time-barred conspiracy through allegations of acts of concealment that, under *Grunewald,* are legally insufficient to extend the scope and duration of the conspiracy.

 To be sure, some acts of concealment are distinctly part of the original conspiratorial agreement, even if not executed until years later. *See, e.g., Forman v. United States,* 361 U.S. 416, 423–24, 80 S.Ct. 481, 485–86, 4 L.Ed.2d 412 (1960); *United States v. Portner,* 462 F.2d 678, 680–81 (2d Cir.), *cert. denied,* 409 U.S. 983, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). Here, the Government contends that at least one of the alleged objects of the original conspiracy—the maintenance of falsified Chromalloy records subject to FAA inspection (¶¶ 54, 57)—was still in the process of being implemented well beyond 1990. Such an allegation, however, does not save Count Six from being time-barred, since for statute of limitations purposes, it is the making, and not the maintaining, of these records that is relevant. *United States v. Sloan,* 389 F.Supp. 526, 528–29 (S.D.N.Y.1975); *see also Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). Moreover, none of the alleged overt acts ("e" through "h") that fall within the statute of limitations appear to relate directly to the object of defrauding the FAA. Finally, as discussed *supra,* the Indictment's conclusory allegation of a continuing fraud on the FAA, when scrutinized in terms of the more particularized allegations of the Indictment, reduces to a combined allegation of two different activities: Gabriel's original making and maintaining of the falsified records in order to facilitate the underlying fraud and Vitti's continued maintenance of the falsified records, after the fraud had been exposed, in order to limit liabilities. Indeed, if it were otherwise, Count Six of the original indictment would doubtless have alleged Gabriel's

maintenance of the falsified records as a post–1990 overt act saving the count from dismissal.

Pointing to another of the original objects of the conspiracy—the fraud on Chromalloy's customers (¶ 55)—the Government attempts to bring Mr. Vitti's overt acts of deceiving Air India within the scope of the original conspiracy by referring to them as examples of "lulling" activity designed to help continue the fraud, rather than to obstruct its detection. But this does not fairly comport with the particularized allegations of the Indictment. The communications to Air India specified as the only overt acts in the Indictment that fall within the statute of limitations are not alleged to have been undertaken in furtherance of lulling Air India into continuing its purchases of faulty engine parts, but rather as attempts to prevent Air India, after it had already uncovered evidence of the fraud, from detecting the full scope and nature of the scheme, and thereby demanding fuller restitution. (¶¶ 49–51). Indeed, by contrast with the backdating (overt act "d") that Gabriel procured in August, 1989 in an effort to prevent the underlying fraud from unraveling, Vitti's overt acts of deception toward Air India were all undertaken, as the Indictment alleges, after the fraudulent welding had ceased in November, 1989. *See United States v. Marcus Schloss & Co., Inc.,* 710 F.Supp. 944, 949 (S.D.N.Y.1989) (SEC investigation served both to end insider trading scheme and to precipitate cover-up scheme; accordingly, the cover-up activities were not part of the original conspiracy and were barred by *Grunewald* ).

In short, when the conclusory allegations of Count Six are scrutinized against the background of the original pleading and the more particularized allegations of the Indictment itself, they provide no basis for concluding that the added overt acts were undertaken in furtherance of an aim of the original conspiracy. It is one thing to accept a facially sufficient indictment at face value (*see Hamling, supra* ); but it would be quite another to allow broad conclusory allegations to override more particularized allegations of the same pleading, especially when an earlier version of the pleading containing many of

the same conclusory allegations was concededly defective. *Cf. Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); *Moscowitz v. Brown,* 850 F.Supp. 1185, 1190 (S.D.N.Y.1994) (civil cases holding that the legal sufficiency of a pleading will be assessed by reference to its well-pleaded allegations of fact, not by reference to its unsupported conclusions).

The Court, therefore, finds that, on the face of the pleading, Count Six remains time-barred. Unlike the situation involving multiple conspiracies, the Court is unaware of any authority that requires submission of this issue to a jury. Indeed, *Grunewald,* although a post-conviction case, decided the issue as a matter of law.

Besides, postponement of the issue until the submission of the evidence would be a futility, for the Government has indicated that its proof that the original conspiracy embraced the added overt acts will consist largely of inferences and implications to be drawn from the acts of concealment themselves. This will not suffice, for as the Court stated in *Grunewald:*

> [A]llowing such a conspiracy to conceal to be inferred or implied from mere overt acts of concealment would result in a great widening of the scope of conspiracy prosecutions, since it would extend the life of a conspiracy indefinitely. Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement upon the conspirators. For every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases....

*Grunewald,* 353 U.S. at 402, 77 S.Ct. at 972.

Accordingly, *Grunewald* required that the Government adduce *direct* evidence that the particular acts of concealment relied on to extend the statute of limitations were fully

embraced within the original aims of the conspiracy. *Id.,* at 404, 77 S.Ct. at 973–74. But at the hearing before this Court on March 15, 1996, the Government, with commendable candor, represented that it would not be able to adduce such direct evidence at trial (despite having entered into a cooperation agreement with one of Gabriel's admitted co-conspirators). This representation obviates the necessity of requesting *in camera* submissions of proof, as in *Marcus Schloss, supra,* let alone postponing application of the *Grunewald* doctrine until trial.

It may be noted that *Marcus Schloss* was in some respects a worse case for pretrial application of *Grunewald* than the instant case because the indictment in that case specifically recited not only that all the activities described were in furtherance of a single conspiracy but that a specific object of that conspiracy was the cover-up activities of trying to obstruct and divert the SEC's inquiries into the defendants' insider trading. *Marcus Schloss,* 710 F.Supp. at 947. The Government argued that these facially sufficient allegations in the indictment were sufficient to preclude pre-trial application of the *Grunewald* doctrine. *Id.* But the court declined to accept these conclusory allegations as dispositive in the absence of any direct "proof of an express original agreement on the part of the conspirators to commit and suborn perjury before the SEC if the conspiracy was detected." *Id.* at 950.

In so holding, Judge Haight indicated that he was concerned about the prejudice that would inure to certain of the defendants if *Grunewald* were not applied prior to trial. Specifically, two of the co-conspirators in *Marcus Schloss* had no role whatever in the cover-up activities, and yet, if those activities had not been stricken from the indictment at the outset, would have been linked to those activities throughout the trial, subject only to the Court's rulings at the conclusion of the case. Here, the threat of such prejudice is even more severe, for defendant Vitti, who concededly had no personal role in the underlying fraud of 1985–90 (*see* Count Seven) will, if application of *Grunewald* is postponed until the close of evidence, be linked for weeks to extensive testimony regarding the presumptively time-barred welding conspiracy in which he is named.

There is, moreover, an even stronger reason for applying *Grunewald* here than was the case in *Marcus Schloss,* and that is the very policy that gave rise to *Grunewald* itself, *viz.,* the policy of the statute of limitations in preventing a defendant from having to defend against stale and ancient charges. *See Toussie,* 397 U.S. at 114–15, 90 S.Ct. at 860. Indeed, the Government argued in *Marcus Schloss* that a primary reason why *Grunewald* should not be applied on a pretrial basis in that case was the absence of a statute of limitations concern. *Marcus Schloss,* 710 F.Supp. at 946. Here, that concern helps make this case especially appropriate for pre-trial application of *Grunewald.*

It is true that, in one respect, *Marcus Schloss* represents a less onerous application of *Grunewald* than that undertaken here, in that the effect of such application in *Marcus Schloss* was simply to delete the offending paragraphs of the conspiracy count, whereas here it leads to dismissal of the entire count. This Court therefore invited supplemental briefing by the parties as to whether Count Six could be saved by redacting the offending paragraphs of the count, leaving only the 1990–1991 cover-up conspiracy. Upon review of the supplemental submissions, the Court concludes that it has the power to make such redactions, *e.g., United States v. Miller,* 471 U.S. 130, 144, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985); *United States v. Rosenthal,* 9 F.3d 1016, 1022 (2d Cir.1993), and that, while somewhat awkward, such redaction might be accomplished here. Nevertheless, the Court concludes that such an approach would be highly artificial in this case. The history of Count Six demonstrates that the central focus of its charges was always upon the original conspiracy of 1985–1989. To recast it as a 1990–1991 cover-up conspiracy, to which the events of 1985–1989 are relevant (if at all) as background or as proof of motive and intent, would be to close one's eyes to history and to elevate words over reality. The Court declines to do so.

Accordingly, for the reasons set forth above, the motion to dismiss Count Six is granted.

*III. The Remaining Motions (re: Counts 4, 8, 9, 13, 14, 15, 16, 17, 18)*

■ The defendants also move to dismiss the mail fraud, wire fraud, and false statement counts of the Indictment, on the ground that they fail to specify with particularity the particular mailings, interstate wire communications, and false documents on which these counts are predicated, describing them, instead, in terms of categories. But these counts, as pleaded, are more than sufficient, on their face, to place the defendants on notice of the charges they are being forced to meet. *Hamling,* 418 U.S. at 117–18, 94 S.Ct. at 2907–08; *Salazar,* 485 F.2d at 1277; *United States v. Gordon,* 780 F.2d 1165, 1169 (5th Cir.1986). The greater particularization of such specifications, mandated in a civil proceeding by Rule 9(b) of the Rules of Civil Procedure, is provided in a criminal case, not by particularity in the indictment, but by the requisite responses to a bill of particulars. *Cf. United States v. Upton,* 856 F.Supp. 727, 740–41 (E.D.N.Y.1994). At the hearing of March 15, 1996, the defendants acknowledged that they had now received particularization as to which phone calls, wire transmissions, and false documents the Government was planning to rely on with respect to each of the counts here challenged, and the Government agreed to be bound by such specifications. No policy would be served by requiring more.

The Court has also considered the various other claims and arguments of the parties, and finds no basis for disturbing any of the rulings set forth above or made from the bench on March 15, 1996.

So Ordered.